**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Joel D. BAILEY, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 28, 2008.

Filed April 25, 2008.

Maureen McQuillan, Johnstown, for appellant.

Jerry L. Spangler, Asst. Dist. Atty., for Com., appellee.

BEFORE: BENDER, GANTMAN and TAMILIA, JJ.

OPINION BY BENDER, J.:

¶ 1 Joel D. Bailey (Appellant) appeals from the August 7, 2007, judgment of sentence of 30 days to 6 months imprisonment, fines, and costs imposed after he was convicted of driving while imbibing [1] and driving under the influence of a high rate of alcohol.[2]

¶ 2 On June 13, 2006, at approximately 7 p.m., Officer Rice of the Windber Borough Police Department observed a black Pontiac TransAm being operated "at a high rate of speed." N.T., Suppression Hearing, 4/2/07, at 5, 7, 22. Officer Rice further testified that he noticed that the TransAm exhaust system was "very loud." *Id.* at 8. The vehicle looked similar to a vehicle Officer Rice knew as being owned by a party with a suspended driver's license. *Id.* Acting on this suspicion, Officer Rice radioed Officer Walls of the Paint Township Police Department.[3] *Id.* at 9. Officer Rice testified that he asked Officer Walls

---

1. 75 Pa.C.S. § 3802(a)(1).

2. 75 Pa.C.S. § 3802(b).

3. Windber Borough and Paint Township are parties to a mutual aid agreement. *See* 42 Pa.C.S. § 8953(e).

to keep a lookout for a TransAm "with [an] extremely loud exhaust." *Id.* at 9–10. Officer Rice also informed Officer Walls that he suspected the TransAm was being oper-ated by a driver with suspended operating privileges. *Id.*

¶ 3 Approximately seven hours after receiving this information, Officer Walls spotted a black TransAm. Officer Walls testified that he received a radio call from Officer Rice informing him to be on the lookout for a TransAm with "no exhaust" system. *Id.* at 39. Officer Walls also testified that when he spotted the TransAm, he noticed the exhaust system of the vehicle was louder than the exhaust systems of other TransAms he had been around. N.T. at 34. Officer Walls testified that he then pulled over the TransAm because he had a reasonable suspicion the vehicle was equipped with what he deemed to be a "faulty exhaust," based on the noise the system was making, and because he thought "the person operating the vehicle was under suspension." *Id.* at 35, 40.

¶ 4 Upon pulling over the TransAm, Officer Walls discovered Appellant driving the vehicle and the unlicensed party Officer Rice had suspected was driving the vehicle was sitting in the passenger seat. N.T., 6/12/07, at 7, 18. Officer Rice arrived at the scene of the stop within minutes. He confronted Appellant and immediately detected a strong odor of alcohol emanating from the vehicle. He ordered Appellant out of the vehicle and then administered a series of sobriety tests, which Appellant failed. Appellant also failed a breathalyzer test administered at the police station. On June 15, 2006, Appellant was charged accordingly.

¶ 5 On January 3, 2007, Appellant filed an omnibus pre-trial motion requesting, *inter alia,* that the trial court suppress the evidence seized after Officer Walls stopped Appellant because Officer Walls did not have reasonable suspicion to stop Appellant. The court denied the motion and the case proceeded to a non-jury trial, at the conclusion of which the trial court returned its guilty verdict. This appeal ultimately followed in which Appellant raises the following question for our review:

> Whether the lower court erred in denying the appellant's motion to suppress blood alcohol result evidence seized by the police because the police lacked requisite suspicion to initiate the traffic stop.

Brief for Appellant at 3.

¶ 6 Our standard and scope of review over the denial of a motion to suppress is as follows:

> When we review the ruling of a suppression court, we must ascertain whether its factual findings are supported by the record and whether the inferences and legal conclusions drawn from those facts are reasonable. Where the defendant challenges an adverse ruling of the suppression court, we will consider only the evidence for the prosecution and whatever evidence for the defense that remains uncontradicted in context of the whole record. If there is support on the record, we are bound by the facts as found by the suppression court, and we may reverse that court only if the legal conclusions drawn from these facts are in error.

*Commonwealth v. Fulton,* 921 A.2d 1239, 1242 (Pa.Super.2007), *appeal denied,* 594 Pa. 686, 934 A.2d 72 (Pa.2007), *quoting Commonwealth v. Petroll,* 558 Pa. 565, 738 A.2d 993, 998 (1999) (citations omitted).

¶ 7 Both Article I, Section 8 of the Pennsylvania Constitution, **Security from searches and seizures,**[4] and the

---

4. Article I, Section 8 provides: "The people shall be secure in their persons, houses, pa-

Fourth Amendment of the United States Constitution, **Unreasonable searches and seizures,**[5] protect citizens of this Commonwealth from unwarranted seizures by law enforcement officials. *Petroll,* 738 A.2d at 998. As provided for by statute, anytime a police officer has "reasonable suspicion" to believe a violation of the Motor Vehicle Code is occurring or has occurred, the officer may initiate an investigatory vehicle stop. 75 Pa.C.S. § 6308; *See also Fulton,* 921 A.2d at 1240 n. 2. Reasonable suspicion exists when an officer is able to articulate specific observations which, when considered with reasonable inferences derived therefrom, lead to a reasonable conclusion, in light of the officer's experience, that criminal activity is afoot and the person seized was engaged in the criminal activity. *Fulton,* 921 A.2d at 1243. We consider the totality of the circumstances in determining whether reasonable suspicion existed to justify an investigatory traffic stop. *See id.* at 1243.

 ¶ 8 We begin our analysis by recognizing that the information accumulated by the police prior to stopping Appellant came from two sources, *i.e.,* Officers Rice and Walls. Thus, although Officer Walls ultimately stopped Appellant, he did so, in part, based upon the information received from Officer Rice.

> A police officer, however, need not personally observe the illegal or suspicious conduct, which forms the basis for the reasonable suspicion, but may rely, under certain circumstances, on information provided by third parties.

. . .

> Pennsylvania law also permits a vehicle stop based upon a radio bulletin if evidence is offered at the suppression hearing to establish reasonable suspicion. The mere fact that the police receive their information over the police radio does not, of itself, establish or negate the existence of reasonable suspicion.

*Commonwealth v. Korenkiewicz,* 743 A.2d 958, 963–65 (Pa.Super.1999) (en banc) (citations omitted). While *Korenkiewicz* involved the police receiving information from a known citizen, in *Commonwealth v. Fromal,* 392 Pa.Super. 100, 572 A.2d 711, 717 (1990), we explained that one officer may also act upon information received from another officer, albeit in the context of an arrest rather than an investigative detention; a distinction without a difference as applied to the case before us.

> An arresting officer is not required to have sufficient information to establish probable cause for the arrest so long as the officer ordering the arrest possessed sufficient information giving rise to probable cause. Further, an arresting officer in executing a valid arrest may rely on radio broadcasts emanating from police authorities in one of the following instances: 1) when he is ordered or directed to perform the arrest by an officer in possession of facts justifying the arrest, 2) when he receives information over the radio justifying the arrest, or 3) when a combination of facts heard over the radio and acquired otherwise provides requisite probable cause.

pers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."

**5.** The Fourth Amendment provides in pertinent part: "The right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

*Fromal,* 572 A.2d at 717 (citations omitted). Herein, Officer Walls' reasons for stopping Appellant were based upon his own observations and information received from Officer Rice, and there is no impropriety in so establishing his basis of knowledge.

¶ 9 Appellant initially contends that Officer Walls' belief that the TransAm was being operated by an unlicensed driver was insufficient to establish reasonable suspicion to justify the investigatory stop. *See* Brief for Appellant at 9, *citing Commonwealth v. Andersen,* 753 A.2d 1289 (Pa.Super.2000). In *Andersen,* a panel of this Court concluded that "the knowledge a vehicle is owned by an individual whose driving privileges are suspended coupled with the ***mere assumption*** that the owner is driving the vehicle, does not give rise to articulable and reasonable grounds to suspect that a violation of the Vehicle Code is occurring every time this vehicle is operated during the owner's suspension." *Id.* at 1294. The Commonwealth concedes that "under [*Andersen* ] ... observation of the operation of a motor vehicle owned or registered by a person with a suspended license does not rise to the level of reasonable suspicion of a vehicle code violation." Brief for Appellee at 10–11. In the instant matter, Officer Rice's testimony establishes he merely assumed the unlicensed driver was operating the TransAm. N.T., 4/2/07, at 8, 24.

■ ¶ 10 *Andersen* was decided under the precursor to current section 6308(b), which provided that an officer had to have probable cause that a provision of the Motor Vehicle Code was being violated before initiating a traffic stop. 2003 Pa. Laws 24, No. 8 (9/30/03, effective 2/01/04). The current version of section 6308(b), promulgated in 2003, requires only reasonable suspicion of a violation. The distinction is of no moment to our analysis, however, as it is well-settled that a mere assumption is not synonymous with reasonable suspicion. *See Commonwealth v. Zook,* 851 A.2d 178, 181 (Pa.Super.2004) (stating, "In determining whether an officer acted according to reasonable suspicion, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to specific inferences he is entitled to draw from the facts in light of his experience.") (citation omitted). Accordingly, Officer Wall's hunch that the TransAm's driver may have been operating the vehicle with a suspended license was insufficient to establish a reasonable suspicion that would have justified stopping the vehicle.

■ ¶ 11 Our inquiry does not end here though. Officer Walls testified on numerous occasions during the suppression hearing that he initiated the investigatory traffic stop because he suspected the TransAm was being operated by a driver with suspended operating privileges ***and*** because he had a reasonable suspicion the TransAm had a faulty exhaust system. N.T., 4/2/07, at 33, 35, 39, 40, 41–42. The salient provision of the Motor Vehicle Code states, in relevant part, as follows: ·

(a) COMPLIANCE WITH ESTABLISHED SOUND LEVELS.—Every motor vehicle operated on a highway shall be constructed, equipped, maintained and operated so as not to exceed the sound level for the vehicle as prescribed in regulations promulgated by the department. The test procedures and instrumentation to be utilized shall also be established by regulation.

\* \* \*

(c) MUFFLERS AND RELATED EQUIPMENT.—Every motor vehicle shall be equipped with a muffler or other effective noise suppressing system in good working order and in constant operation and no muffler or exhaust sys-

tem shall be equipped with a cutout, bypass or similar device.

(d) UNAUTHORIZED MODIFICATION OF EQUIPMENT.—No person shall modify the exhaust system of a motor vehicle in a manner which will amplify or increase the noise emitted by the motor of the vehicle above the maximum levels permitted under subsection (a) or violate the provisions of subsection (b).

75 Pa.C.S.A. § 4523, **Exhaust systems, mufflers and noise control.**

¶ 12 Officer Walls' testimony implicates both subsections (a) and (c). Under section 4523(a), a violation occurs if the vehicle emits sound in excess of the permitted level prescribed by regulation, and under section 4523(c), a violation occurs if the vehicle's muffler is not in good working order. Appellant argues that since the statute states that regulations shall establish the proscribed sound levels, the testing procedures and instrumentation to be used, a law enforcement officer cannot stop a vehicle for a suspected sound violation unless he or she is trained in accordance with such regulations.

¶ 13 We begin our analysis by recognizing that under the precursor to section 4523(a)—75 P.S. § 828(a)—provided as follows: "No person shall operate a motor vehicle, except fire department and fire patrol apparatus, on a highway unless such motor vehicle is equipped with a muffler, in good working order, and, in constant operation to prevent excessive or unusual noise." Former section 828(c) further provided: "No violation charged under this section for causing excessive noise shall be proved except by the testimony of at least two (2) peace officers who were on the scene of the alleged violation each testifying that in his opinion the noise caused was excessive and each describing such excessive noise."

¶ 14 The innate flaw in establishing a sound violation beyond a reasonable doubt under former section 828(a) is self-evident. It is virtually impossible to determine what "excessive or unusual" noise is without a particularized and constant definition of this standard and a defined method of testing to see if the standard is being violated. In recognition of this flaw, our General Assembly eliminated both the section 828(a) subjective "excessive or unusual noise" test and the section 828(c) "two peace officers" quantum of proof in 1977 in favor of the fully objective section 4523(a) "regulations promulgated" quantum of proof. 1976 Pa. Laws 162, No. 81 (06/16/1977, effective 7/1/1977).

¶ 15 The "regulations promulgated by the department" referenced in section 4523(a) are set forth over a twelve page span in Title 67 of the Pennsylvania Code. Section 157.11, **Vehicular noise limits,** (a) *Prohibition,* provides, in pertinent part, any motor vehicle weighing under 6,000 pounds must be equipped with an exhaust system that emits noise within the following limits: 1) 76 decibels for a motor vehicle traveling 35 miles per hour (m.p.h.) or less on a "soft site;" 2) 82 decibels for a motor vehicle traveling 35 m.p.h. or above on a "soft site;" 3) 78 decibels for a motor vehicle traveling 35 m.p.h. or less on a "hard site;" and, 4) 84 decibels for a motor vehicle traveling 35 m.p.h. or above on a "hard site." *Id.* at Table 1.

¶ 16 The regulations provide: "Any police officer shall be authorized to inspect, examine and test a motor vehicle in accordance with the procedures specified in this chapter." 67 Pa.Code § 157.21. The regulations further provide: "Police officers selected to measure sound level of vehicles operated on highways shall have received training in the techniques of sound measurement and the operation of sound measuring instruments." 67 Pa.Code

§ 157.21(c). The regulations set forth intricate testing procedures for law enforcement to follow in determining whether an exhaust system comports with the section 157.11(a) sound limits.

¶ 17 There is no doubt that if the Commonwealth, in its discretion, decides to prosecute an individual for a sound violation under section 4523(a), it must adduce sufficient evidence, produced in accordance with the regulations set forth in Title 67, that would establish beyond a reasonable doubt that a violation has occurred. However, that is not the case before us. Here, officer Walls suspected a violation of section 4523(a), and when he stopped Appellant, he and Officer Price found that Appellant had committed an offense of much greater gravity, *i.e.*, DUI. Thus, the Commonwealth never prosecuted Appellant for a violation of section 4523(a).

¶ 18 The question remains though whether Officer Walls was justified in stopping Appellant based upon a suspected violation of section 4523(a) even though Officer Walls had neither the training nor the instrumentation to establish beyond a reasonable doubt that the sound emitted by Appellant's vehicle exceeded the prescribed sound levels. We now hold that while such evidence is necessary to establish guilt beyond a reasonable doubt, it is certainly not a necessary pre-cursor to a traffic stop and the concomitant investigative detention.

¶ 19 To hold otherwise would be the equivalent of requiring law enforcement officers of our Commonwealth to be certified as lab technicians before they stop a suspected perpetrator for a drug or DUI

violation. Thus, were we to accept Appellant's position, a vehicle's exhaust system could be so loud that it shakes the officer out of his or her boots, and yet the officer would not be able to stop the vehicle because the officer does not have the technical training to establish a sound violation beyond a reasonable doubt. And so while the citizens of our Commonwealth are regularly assaulted by sounds emanating from amplified exhaust systems, officers will not be permitted to stop such vehicles, even when basic common sense would lead them *to reasonably suspect* that there has been a violation.

¶ 20 We do not hold law enforcement officers to the high technical standard espoused by Appellant because we know that through their experience and their observations in any given case, they may be able to articulate observations that lead them to the reasonable conclusion that criminal activity is afoot. In the instant case, Officer Walls testified that he heard Appellant's vehicle emitting a sound through its exhaust system that was louder than other cars of this make and that this led him to suspect a faulty exhaust system. Furthermore, Officer Rice testified that he instructed Officer Walls to stop Appellant because the vehicle had an "extremely loud exhaust." N.T., 4/2/07, at 9.[6] We conclude that such testimony was sufficient to establish a reasonable suspicion that the vehicle was in violation of section 4523(a).

¶ 21 Similarly, we conclude that if an officer hears an unusually loud exhaust, the officer may reasonably infer that there is a problem with the muffler and initiate a stop based upon a reasonable suspicion

---

**6.** While Officer Rice made this observation several hours before Officer Walls made the stop, we conclude that under these circumstances, the elapsed time does not diminish the value of this information, as it was unlikely that the vehicle's exhaust system was re-

paired during non-business hours between 7:00 P.M. and 2:00 A.M., when the stop occurred. Furthermore, when Officer Walls encountered the vehicle it was still emitting a loud sound.

that the muffler is not "in good working order." 75 Pa.C.S. § 4523(c). In the instant case, Officer Walls testified that he suspected a faulty exhaust system based upon the loud exhaust. It was not necessary for him to visually observe a defective muffler before initiating a stop on this basis. Just as an officer may conduct an investigative detention when he or she smells burning marijuana emanating from the direction of someone smoking a hand-rolled cigarette or "blunt," so can an officer stop a vehicle when he or she hears what sounds like a faulty muffler. While such a subjective impression is insufficient to establish guilt of a violation, it is sufficient to support an investigative detention.[7]

¶ 22 Judgment of sentence affirmed.

¶ 23 Judge Tamilia files a dissenting opinion.

### DISSENTING OPINION BY TAMILIA, J.:

¶ 1 The majority's Opinion, while proposing an analysis which brings together reasonable suspicion to make a stop and a muffler noise violation, fails to establish a legal basis for evidence of the muffler violation. For This reason, I respectfully dissent. The language of 75 Pa.C.S.A. § 4523, **Exhaust systems, mufflers and noise control,** (a) **Compliance with established sound levels,** (c) **Mufflers and related equipment,** the provisions of the Pennsylvania Code section 4523(a) incorporates by reference, the Pennsylvania and United States Constitutions, and common sense all compel a result opposite of that which the majority advances.

¶ 2 Section 4523(a) provides, in pertinent part, the sound emitted by a muffler is "not to exceed the sound level for the vehicle as prescribed in regulations promulgated by the department." It further provides: "The test procedures and instrumentation to be utilized *shall* also be established by regulation." *Id.* (emphasis added). The regulations referenced by section 4523(a), as noted by the majority, are set forth in Title 67 of the Pennsylvania Code. The relevant Title 67 regulations, among other things, provide: "Any police officer shall be authorized to inspect, examine and test a motor vehicle *in accordance with* the procedures specified in this chapter." 67 Pa.Code § 157.21, **Inspection and examination of motor vehicles,** (a) *Police authorization* (emphasis added). The regulations further provide: "Police officers selected to measure sound level of vehicles operated on highways *shall* have received training in the techniques of sound measurement and the operation of sound measuring instruments." 67 Pa. Code 157.21(c), *Training* (emphasis added); *see Chanceford Aviation Props. v. Chanceford Township Bd. of Supervisors,* 592 Pa. 100, 923 A.2d 1099, 1104 (2007) ("The word 'shall' by definition is mandatory, and it is generally applied as such."), *citing Oberneder v. Link Computer Corp.,* 548 Pa. 201, 696 A.2d 148, 150 (1997).

¶ 3 Both Article I, § 8 of the Pennsylvania Constitution, **Security from searches and seizures,** and the Fourth Amendment of the United States Constitution, **Unreasonable searches and seizures,** protect citizens of this Commonwealth from, amongst other evils, "unreasonable" seizures. What could be more unreasonable, or for that matter more logically infirm, than allowing a police officer to formulate reasonable suspicion that a crime he has never been trained to investigate or charge

---

**7.** We also note, as *dicta,* that even though Appellant was not prosecuted for a section 4523 violation, the vehicle owner testified at trial that the vehicle in fact was missing a muffler. N.T., 6/12/07, at 5.

is occurring—especially when this training is required by statute?

¶ 4 The majority seeks to answer this intractable dilemma by advancing the following analogy:[8] "To hold [an officer must be trained as required by statute before initiating a stop based on a suspected violation of section 4523(a)] would be the equivalent of requiring law enforcement officers of our Commonwealth to be certified as lab technicians before they stop a suspected perpetrator for a drug or DUI violation." Op. at 814. The majority fails to recognize this analogy is inherently flawed. Title 75 Pa.C.S.A. § 3802, **Driving under influence of alcohol or controlled substance,** (a) **General impairment,** allows an offender to be prosecuted "after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle," and section 3802(d)(2), **Controlled substances,** allows an offender to be prosecuted in like circumstances when he or she is driving under "the influence of a drug or combination of drugs." In other words, not every drug or DUI violation need be proven with the use of testing mechanism, such as a blood test or breathalyzer. *Cf.* 67 Pa.Code 157.21(c). Section 4523(a) does not allow

sound violations to be prosecuted without the use of testing mechanisms. This distinction between sections 3802(a) and (d) and section 4523(a) implicates the broader problem with the majority's analogy. A drug or DUI stop can be initiated by an officer who possesses reasonable suspicion premised on facts common to everyday experience. For example, every one recognizes when a driver is swerving into an oncoming lane. An officer does not need specialized training to make such an observation and, as a consequence, such training is not required by statute. This reasonable suspicion can then be substantiated by resorting to other facts common to everyday experience—an observation of bloodshot eyes or slurred speech, etc. I have difficulty accepting the proposition that an untrained officer can reasonably suspect "through their own experience and their observations," Op. at 814, that a moving vehicle is operating with an exhaust system that emits noise in excess of 76 to 84 decibels, depending on the attendant conditions. *See* 67 Pa.Code 157.11, **Vehicular noise limits,** (a) *Prohibition.* Relying on an indisputable visual perception is much different than relying on an untrained and disputable appreciation of moving sound.[9] The General Assembly

8. The majority also sets forth a second analogy: "Just as an officer may conduct an investigative detention when he or she smells burning marijuana emanating from the direction of someone smoking a hand-rolled cigarette or 'blunt,' so can an officer stop a vehicle when he or she hears what sounds like a faulty muffler." Op. at 815. The distinction between formulating reasonable suspicion based on a trained appreciation of the smell of marijuana and formulating reasonable suspicion based on an untrained and disputable appreciation of moving sound should be, or will become, apparent. *See infra.*

9. There are only two "sound violations" contained within the Vehicle Code. The first is the faulty exhaust prohibition provided by 75

Pa.C.S.A. § 4523, **Exhaust systems, mufflers and noise control,** (a) **Compliance with established sound levels.** The second is a prohibition against "certain sound devices" provided by 75 Pa.C.S.A. § 4535, **Audible warning devices,** (b) **Certain sound devices prohibited.** Section 4535(b) contains an absolute prohibition against "siren[s], bell[s], whistle[s]". Section 4535(b) also contains a residual prohibition against "any device emitting a similar sound or unreasonably loud or harsh sound." Notably, my research failed to uncover a single reported or unreported decision in which a police officer predicated an investigatory stop on reasonable suspicion that a driver was in violation of the section 4535(b) residual prohibition.

implicitly recognized as much when it replaced the subjective and vague quantum of proof required by former 75 P.S. § 828(a), which was based solely on an untrained and disputable appreciation of moving sound, with the wholly objective and empirical quantum of proof in current section 4523(a). *See* Op. at 813–14.

¶ 5 The majority takes its analysis a step further by unnecessarily holding that once "an officer hears an unusually loud exhaust, the officer may reasonably infer that there is a problem with the muffler and initiate a stop based upon a reasonable suspicion that the muffler is not 'in good working order.'" [10] 75 Pa.C.S.A. § 4523(c). I respectfully note my disagreement with this holding. Section 4523(c) requires every vehicle to be equipped with a muffler "in good working order." Given the context in which this phrase appears, it unquestionably refers to the structure of a vehicle's exhaust system, not the sound level the system emits. If reasonable suspicion and conviction under section 4523(c) could be predicated on sound level alone, as the majority holds, the language of section 4523(a) would not only be mere surplusage, it would be nullified. While there is no question sound level is a relevant factor in formulating reasonable suspicion that a section 4523(c) violation is occurring, it cannot be the only factor.

¶ 6 The facts of this case illustrate the way in which section 4523(a) can now be used as a pre-text to initiate traffic stops. At the suppression hearing, Officer Rice testified he initially suspected the TransAm was being operated by a driver with a suspended license and that: "[i]t was going very fast." N.T., Suppression Hearing, 4/2/07, at 7–8. Officer Rice wrote in his narrative report: "We saw a black Trans AM go by driving in a reckless manner."

Record, No. 5, Exb. A. Officer Rice testified, after subtle prodding from the prosecutor, the TransAm was "much louder" than "other Firebirds that would have passed." N.T. at 8. In his narrative, however, Officer Rice noted that he initially noticed, "[h]alf of the exhaust was missing." Record, No. 5, Exb. A.

¶ 7 At the outset, Officer Walls testified he was on the lookout for the TransAm because he had been told by Officer Rice the "vehicle was to have no exhaust and the driver was to be ... under suspension." N.T. at 39. Officer Walls then testified he pulled over the TransAm "because of the loud exhaust and I thought the person operating the vehicle was under suspension." N.T. at 40. Yet, Officer Walls conceded on cross-examination he did not make any mention of a loud exhaust in his call notes and also could not recall what pieces were missing from the TransAm exhaust, although he did recall personally examining the exhaust system. N.T. at 37, 40. Officer Rice, while pumping gas, purportedly was able to see half of the TransAm's exhaust was missing simply by viewing the vehicle "going very fast" in passing. N.T. at 9; *see also* Record, No. 5, Exb. A. Yet Officer Walls, despite following the TransAm for approximately "quarter to half a mile" and despite the fact he apparently had been instructed by Officer Rice to look out for a TransAm with no exhaust, did not testify to seeing any structural deficiencies with the vehicle's exhaust. N.T. at 35. To the contrary, Officer Walls testified he suspected the TransAm exhaust was faulty based solely on: "The noise, how loud it was." *Id.* He never testified to seeing "half of the exhaust missing" before pulling the TransAm over.[11]

10. The majority fails to define the term "unusual." A motorcycle exhaust system would often be considered "unusually" loud when compared to most car exhaust systems.

¶ 8 It is clear from the evidence of record the suspected noise violation is an *ad hoc* rationalization contrived to justify an otherwise unwarranted traffic stop. The majority's holding gives officers free rein to pull over vehicles based on the reasonable suspicion an exhaust system is "just louder" than other exhaust systems or is "unusually loud" without having the training required to formulate this reasonable suspicion and without being equipped with the expertise to substantiate this suspicion. *See* N.T. at 34. There is no question but that at first glance, this situation presents what appears to be a Hobson's choice. On one hand, the General Assembly has made it clear drivers who operate vehicles with exhaust systems that violate the sound limits set forth in 67 Pa.Code § 157.11(a) are to be penalized. On the other hand, the General Assembly, by virtue of requiring intricate and time-consuming training, has imposed a burdensome requirement officers must satisfy before being able to articulate reasonable suspicion that an exhaust system violation is occurring. But the General Assembly, in my opinion, has made its intentions known. The real choice in this case is between disregarding unequivocal statutory and codified language in hopes of mitigating the perceived malevolence which results from: "the citizens of our Commonwealth [being] regularly assaulted by sounds emanating from amplified exhaust systems" (Op. at 814), and upholding Constitutional protections. This is a choice which is not difficult for me to make. In my opinion, the majority's holdings today extend the power of police to untenable limits. For the above stated reasons, I dissent.

11. The majority states, "the vehicle owner testified at trial that the vehicle in fact was missing a muffler." Op. at 815, n. 7, *citing N.T.*, Suppression Hearing, 6/12/07, at 5. The vehicle owner also testified the TransAm was equipped with a catalytic converter and a Y pipe and that it was quiet with these two exhaust system components. *Id.* Whatever the case may be, a *post hoc* rationalization is no better than an *ad hoc* rationalization.