J-A23031-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| RAHIM McGILBERRY | |
| | No. 9 EDA 2017 |

Appeal from the Order November 17, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007639-2016

BEFORE: PANELLA, DUBOW, and FITZGERALD[*], JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED NOVEMBER 16, 2017**

The Commonwealth appeals from the order entered in the Philadelphia County Court of Common Pleas granting Appellee Rahim McGilberry's motion for suppression of evidence. The Commonwealth contends that the officers had reasonable suspicion to conduct a protective frisk of Appellee. We affirm.

The trial court summarized the facts of this case as follows:

> A motion-to-suppress hearing was conducted before this court on November 17, 2016. . . . Police Officer Eugene Roher and his partner, Police Officer Jeremy Olesik, were on routine patrol, sitting at a red light at the intersection of 52nd Street and Larchwood Avenue, when Officer Roher observed [Appellee] driving a black Toyota Camry, northbound on 52nd Street with heavy tinted windows, at a high rate of speed. Officer Roher testified

---

[*] Former Justice specially assigned to the Superior Court.

that he also observed the vehicle traveling in the left lane to get around other vehicles that were also traveling northbound. Officer Roher made a left-hand turn onto 52nd Street and got behind [Appellee's] car. He then activated lights and sirens and [Appellee] pulled over at 52nd and Spruce Streets. . . .

Upon approaching the vehicle, Officer Roher could see [Appellee's] body; he could see his shoulders shifting from side-to-side. Because of the shifting, Officer Roher had [Appellee] roll down the windows. As soon as the windows went down, Officer Roher testified that he smelled an odor of burnt marijuana. No one else was in the vehicle. Officer Roher also observed 25-30 very small black rubber bands in a cup holder on the floor of the passenger side. Officer Roher also observed three (3) cell phones, one (1) of which was ringing consistently. . . . According to Officer Roher, [Appellee] was acting nervous and some things he said didn't make sense. . . . Officer Roher asked [Appellee] to exit the vehicle . . . . Officer Roher testified that he decided to frisk [Appellee.]

Officer Roher frisked [Appellee] and in his groin area felt a small hard object consistent with narcotics packaging. Officer Roher recovered 30 blue-tinted packets all containing an off-white chunky substance. From inside the vehicle, Officer Roher recovered two thousand three hundred ($2,300.00) dollars from the cup holder, three hundred eleven ($311.00) dollars from his person and three (3) cell phones. [Appellee] was subsequently arrested.

On cross-examination, Officer Roher conceded that he did not see any marijuana in the vehicle nor did he believe that [Appellee] was under the influence of marijuana. The vehicle was thoroughly searched and no marijuana or remnants of marijuana were found. He agreed that it is not uncommon for someone to appear nervous during a traffic stop. He did not see any weapons in the vehicle before taking [Appellee] out, nor were there was [sic] no visible "bulges." He felt [Appellee's] groin area and felt hard packaging consistent with narcotics—the narcotics were packaged in small plastic bags inside a sandwich bag. Additionally, nowhere on the police record (the 48A) does

it say that [Appellee] went into oncoming traffic; the arrest memo says "crossing the southbound lane"—like tires crossed the center lane . . . .

After the Commonwealth rested, Police Officer Jeremy Olesik (Officer Roher's partner) testified on behalf of [Appellee]. According to Officer Olesik, on July 1, 2016, he and Officer Roher were on routine patrol when they pulled [Appellee] over on the 5200 block of Spruce Street; [Appellee] was pulled over because of the way he was driving—he appeared to be in a rush. He stated that he was not present when his partner asked [Appellee] any questions. . . . On cross-examination Officer Olesik testified that [Appellee] was pulled over for tinted windows and that he passed traffic crossing into the southbound lanes.

Trial Ct. Op., 3/23/17, at 2-4 (citations to the record and footnote omitted).

Appellee was charged with manufacture, delivery or possession with intent to deliver a controlled substance,[1] knowingly or intentionally possessing a controlled or counterfeit substance by a person not registered under this act,[2] and possession of drug paraphernalia.[3] Appellee filed an omnibus pretrial motion to suppress. Following the hearing, the motion was granted. The Commonwealth filed a notice of appeal, certifying that the ruling terminated or substantially handicapped the prosecution of this case.[4]

---

[1] 35 P.S. § 780-113(a)(30).

[2] 35 P.S. § 780-113(a)(16).

[3] 35 P.S. § 780-113(a)(32).

[4] In **Commonwealth v. Bender**, 811 A.2d 1016 (Pa. Super. 2002), this Court noted

The Commonwealth filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, and the trial court filed a responsive opinion.

The Commonwealth raises the following issue for our review: "Did the suppression court err by concluding there was no reasonable suspicion to conduct a protective frisk, where [Appellee] made furtive movements during a night time traffic stop, gave nervous/contradictory answers to the officers' questions, and possessed indicia of drug dealing?" Commonwealth's Brief at 4. The Commonwealth contends that

> the officers had, at a minimum, reasonable suspicion that criminal activity was afoot. After stopping [Appellee's] vehicle at night, police shined a spotlight and observed [Appellee] shifting his shoulders from side to side in an apparent attempt to conceal something. The officers asked [Appellee] to roll down his windows, and upon approach they immediately smelled marijuana. They observed 25 to 30 small rubber black rubber bands, which are commonly used to package drugs. There was also a large stack of cash and three cell phones. When the officers posed questions to [Appellee], he was extremely nervous and gave contradictory answers. He claimed that he was going home to get money, but there was a large stack of cash in the cup holder. He also claimed that he was going to "South Philly," when in fact he was going in the opposite direction. This combination of circumstances

---

that the Commonwealth has an absolute right of appeal to the Superior Court to test the validity of a pre-trial suppression order. Such an appeal is proper as an appeal from a final order when the Commonwealth certifies in good faith that the suppression order terminates or substantially handicaps its prosecution.

*Id.* at 1018 (citations and quotation marks omitted); *see also* Pa.R.A.P. 311(d). Instantly, the Commonwealth has complied with this procedural requirement, and therefore, the appeal is properly before us.

afforded reasonable suspicion that criminal activity was afoot.

\* \* \*

Here, any reasonably prudent officer would have frisked [Appellee] for his safety.

\* \* \*

Under the totality of the circumstances, this evidence was sufficient for the officer to reasonably conclude that his safety was at risk. Accordingly, his protective frisk was lawful.

*Id.* at 9-12.

Our review is governed by the following principles:

When reviewing an Order granting a motion to suppress we are required to determine whether the record supports the suppression court's factual findings and whether the legal conclusions drawn by the suppression court from those findings are accurate. In conducting our review, we may only examine the evidence introduced by appellee along with any evidence introduced by the Commonwealth which remains uncontradicted. Our scope of review over the suppression court's factual findings is limited in that if these findings are supported by the record we are bound by them. Our scope of review over the suppression court's legal conclusions, however, is plenary.

*Commonwealth v. Gutierrez*, 36 A.3d 1104, 1107 (Pa. Super. 2012)

(citation omitted).[5]

---

[5] We note the holding of *In re L.J.*, 79 A.3d 1073 (Pa. 2013), that after October 30, 2013, the scope of review for a suppression issue is limited to the record available to the suppression court. *Id.* at 1085, 1089 (stating holding applies to "all litigation commenced Commonwealth-wide after the filing of this decision").

Further, Pennsylvania Rule of Criminal Procedure 581, which addresses the suppression of evidence, provides, in relevant part, as follows: "The Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights." Pa.R.Crim.P. 581(H).

"Both Article I, Section 8 of the Pennsylvania Constitution,[6] **Security from searches and seizures,** and the Fourth Amendment of the United States Constitution,[7] **Unreasonable searches and seizures,** protect citizens of [Pennsylvania] from unwarranted seizures by law enforcement

---

[6] Article I, Section 8 of the Pennsylvania Constitution provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. Art. I, § 8.

[7] The Fourth Amendment of the United States Constitution provides in relevant part:

> The right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. Const. Amend. IV.

officials." ***Commonwealth v. Bailey***, 947 A.2d 808, 810-11 (Pa. Super.

2008) (footnotes omitted).

In ***Commonwealth v. Simmons***, 17 A.3d 399 (Pa. Super. 2011), this

Court opined:

> [T]he ***Terry*** "stop and frisk," permits a police officer to briefly detain a citizen for investigatory purposes if the officer "observes unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be afoot." ***Commonwealth v. Fitzpatrick***, [ ] 666 A.2d 323, 325 (Pa. Super. 1993); ***Terry v. Ohio***, 392 U.S. 1, 30 [ ] (1968).
>
> ***Terry*** further held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others" the officer may conduct a pat down search "to determine whether the person is in fact carrying a weapon." ***Terry***, 392 U.S. at 24. "The purpose of this limited search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence."
>
> In order to conduct an investigatory stop, the police must have reasonable suspicion that criminal activity is afoot. ***Terry***, 392 U.S. at 30. In order to determine whether the police had reasonable suspicion, the totality of the circumstances—the whole picture—must be considered. "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." To conduct a pat down for weapons, a limited search or "frisk" of the suspect, the officer must reasonably believe that his safety or the safety of others is threatened.

***Id.*** at 403 (some citations omitted). Furthermore,

> to justify a frisk incident to an investigatory stop, the police need to point to specific and articulable facts indicating that the person they intend to frisk may be armed and dangerous; otherwise, the talismanic use of the

- 7 -

phrase "for our own protection," . . . becomes meaningless.

***Commonwealth v. Jackson***, 519 A.2d 427, 431 (Pa. Super. 1986)

(citations omitted).

In the case *sub judice*, the trial court opined:

Here, the Commonwealth has failed to provide specific facts by which to support a finding of reasonable suspicion that criminal activity was afoot. Although the police legitimately pulled [Appellee] over for a motor vehicle violation, they did not have enough evidence to suspect [Appellee] had weapons in his possession, which may have provided the requisite reasonable suspicion to ask [Appellee] to exit his vehicle and be patted down for the officer's safety.

\* \* \*

It was not until after he observed 25-30 very small black rubber bands in a cup holder on the floor of the passenger side and three (3) cell phones, one (1) of which was ringing that he could see that the number was stored on the phone as "Locust Street" that Officer Roher asked [Appellee] to exit the vehicle. He did not testify that he was fearful for his safety or the safety of his fellow officer.

\* \* \*

When viewing these facts in their totality, this court found that Officer Roher did not have reasonable suspicion that [Appellee] was engaged in criminal activity, or that [Appellee] may have been in possession of a weapon in furtherance of criminal activity.

Trial Ct. Op. at 7 (foot note omitted). We agree no relief is due.

At the hearing on the motion to suppress, Officer Roher testified, *inter alia*, as follows:

[Appellee's counsel:] So, now, as I understand it, you're on just a routine patrol on Larchwood facing east, correct?

A: Yes.

Q: You see this car driven by—at that point, could you see who was driving the car?

A: No.

Q: Because the windows were tinted, correct?

A: Correct.

Q: And when you saw that the car went around—when you say it went into the lane, are you saying that it just passed cars on the left?

A: Yes, it passed, I would say, about three—two, three cars on the left.

Q: That's a little different than going into the other lane?

A: Well, it's only two lanes, so he would have to go to the other lane to pass them.

Q: Well, let me ask you this: You prepared the 75-48(A), correct?

A: Most likely my partner because he's the recorder.

Q: Did you have an opportunity to review it prior to today? In fact, you identified it today?

A: Yes.

Q: Okay.

Is it accurate?

A: Let me just read over it.

- - -

(Brief pause.)

- - -

The Witness: Yeah.  I would say yes.

[Appellee's counsel:] Okay.

* * *

Q: So we can agree that nowhere in the 48(A) does it indicate the car went into oncoming traffic, correct?

A: Correct.

Q: All that it said was that it past the car on the left side, correct?

A: Correct.

* * *

Q: But you never said in this report that the car had to go into the oncoming lane when it passed the car on the left, right?  We can agree on that?

A: Correct.

Q: Okay.

Going to your arrest memo.

* * *

Q: Would you agree . . . that that's an accurate reflection of what happened that night?

A: Yes.

* * *

Q: Anywhere in your arrest report does it say he went into oncoming traffic?

A: Crossing the southbound lane.

Q: Crossing. It didn't say he went into, it says crossing. Like, maybe perhaps the tires crossed the center line, correct?

A: Yes.

 *    *    *

Q: Now, what happens is, as I understand it, as soon as you turn on your signals, [Appellee] complies, correct?

A: Absolutely. Yes.

 *    *    *

Q: You approach the car. And as I understand it when you get to the car, you asked him to roll down the window, correct?

A: No. Before I got to the car, I yelled out roll the windows down.

Q: Okay.

   So he rolls the windows down. He complies, as I understand it?

A: Yes.

Q: Now, at that point, you say you now smell marijuana, right?

A: Yes. Burnt marijuana.

 *    *    *

Q: Did you ever test him to determine whether he was under the influence of marijuana?

A: No, I didn't believe he was under the influence upon investigation.

* * *

Q: My question to you is, going to those same documents, the 75-48 and your arrest report, does it say anywhere in there that [Appellee] ever said to you or your fellow officer or anyone in the world, that he was going to pick his daughter up or that he needed to get money?

A: No.

* * *

Q: Now, you indicated that you say that you—did you—you indicated that you saw rubberbands?

A: Yes.

Q: Okay.

   Which you believe, in your opinion, was some—associated with some kind of elicit activity like covering—you know, housing rubberband—you know, packets of drugs, correct?

A: It's commonly used—

Q: Okay.

A:—to package narcotics.

Q: My question to you is, did you receipt those so we can see what they look like?

A: No, I didn't.

* * *

Q: Now you indicate to me, by the way, now that [Appellee] appeared to be nervous, right?

A: Yes.

Q: Which, by the way, you know is not uncommon in almost any kind of traffic stop, correct.

A: Not at all.

Q: "Not at all" meaning I'm right?

A: Correct.

Q: Okay.

So you indicated something about his heart beating?

A: Yes.

*   *   *

Q: So, now, your testimony—and, again, that would be that, you know, you could actually see a heart beat.

**So what you do is you decide, at that point, you're going to take him out and frisk him?**

A: **I took him out because of the shuffling of the shoulders before I approached the vehicle.**

*   *   *

Q: Had you seen any weapons in the car?

A: From my position, no.

Q: Did you see anything that resembled a weapon that could be used defensively against you? A crowbar or anything like that?

A: No. Not that I remember, no.

Q: Did you see any contraband at that point?

A: It depends on what we consider contraband is.

Q: Contraband is drugs. . . .

A: No. No drugs.

Q: Okay.

How about on his person?  Before you actually put a hand on him, did you see any unusual bulges about his person that would indicate that he was armed and dangerous?

A: No.

Q: And, in fact, what happened was when you turned around, he complied completely, correct?

A: Yes, sir.  Absolutely.

Q: So now, at this point, you're doing a full patdown, correct?

A: Yes.

R.R. at 14a-17a (emphasis added).[8]

Officer Roher testified on direct examination as follows:

[The Commonwealth:] Officer, how—during this entire interaction, how is [Appellee] acting?

A: He was in a nervous manner.  The questions that I was asking, quite didn't make sense.  For the speed he was traveling, I was asking him what was he in such a rush for. He said he was going to get his daughter from South Philly.  However, he was traveling northbound on 5-2 and then turned to go west on Spruce.  So like that didn't make sense.

Also, he said he needed to run home and get money. But I also observed that there was money in the cupholder, I believe.

*    *    *

Q: Okay.

---

[8] For the parties' convenience, we refer to the reproduced record where applicable.

And at that point, what did you do?

A: Because of his—the questions—the way he was answering the questions, the nervousness, his breathing pattern, I decided to take him out [sic] the vehicle to conduct a frisk.

&ast; &ast; &ast;

Q: **And when you removed [Appellee] from the vehicle and frisked him, tell this [c]ourt why you decided to do that?**

A: **Well, once I observed the shuffling of the shoulders, I didn't know what he was doing.** He may have been taking his seat belt off, concealing something. I didn't know. So I wanted to just check him out.

Q: Okay.

And this was—the shuffling was prior to you reaching the vehicle, correct?

A: **Yes.**

Q: And prior to [Appellee] rolling his tinted windows down, correct?

A: Yes.

Q: **And when you decided to frisk him, can you tell this [c]ourt why you made that decision?**

A: **For weapons to make sure I'm safe.**

R.R. at 11a, 13a (emphasis added).

We find the suppression court's findings are supported by the record and discern no error of law. *See Gutierrez*, 36 A.3d at 1107. Officer Rohrer lacked reasonable suspicion to believe that criminal activity was afoot

to justify his decision to frisk Appellee. ***See Simmons***, 17 A.3d at 403. The officer did not point to specific and articulable facts to indicate that Appellee was armed and dangerous. ***See Jackson***, 519 A.2d at 431. The officer's bald assertion that his decision was based upon his desire to make sure he was safe did not justify the frisk of Appellee incident to the stop of Appellee's vehicle. ***See id.*** Accordingly, we affirm the order of the trial court granting Appellee's motion to suppress.

Order affirmed.

Judge Panella joins the Memorandum.

Judge Dubow Concurs in the Result.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 11/16/2017*